Good morning, Your Honors. May it please the Court, Donald Putterman for Toll Brothers, with me is my colleague, Casey McNamara. Are you going to be doing all the talking? I will be doing all the talking. All right. And did you want to reserve any time for rebuttal? Yes, Your Honor. I'd like to reserve three minutes for rebuttal. Okay. You may proceed. Thank you. I'm going to emphasize this morning a couple of key points that we believe compel reversal. And those points are going to focus specifically on the power line easement, not the physical power line, but the easement itself, and also on the Subdivision Map Act issue. There are, as the Court is aware, Judge Conte made a number of findings of fact. There are eight findings of fact that he made which we do not dispute and which compel the conclusion, in our view, that he committed an error of law by not applying the California law of anticipated breach implied repudiation. Those key facts are the following. Number 13, which stated that the scheduled closing date was June 30, 2007. Number 28, which quoted Section 13.2, which was the covenant against, I'll summarize it by saying, impairing title or allowing an encumbrance to be recorded against the property before closing date. Number 56, which stated that PG&E determined that the, quote, least expensive way, close quote, to supply temporary power was to go squarely across Subarea 3. And the necessary implication of that finding of fact, because it was specifically stated to be the least expensive way, was that there were, in fact, other ways. And that's actually in the record and it's undisputed that there was another path which did not. And it had to do with a water pump facility. Correct. And this is the easement which allowed the temporary power line to go to the water pump facility. And not surprisingly, in view of that finding of fact, there was no finding or conclusion that it was necessary to go across Subarea 3 to supply temporary power. So although the LHINs have tried to kind of mush that together with the utility vault issue, in fact, while Judge Conte found that the utility vaults, that was part of the backbone required by the purchase and sale agreement, the utility's backbone, he did not make any such finding with regard to the temporary power line. Counsel, Judge Gould, if I could please interject a question. Assuming that permitting the temporary easement for the power line to go in is a breach, what's the law as to whether that's a partial breach or a material breach? That is a- I ask because it sort of seems maybe mistakenly but intuitively that if it's temporary, that it should only be a partial breach. It's-that's a mistaken assumption for two reasons, Your Honor. First of all, by allowing PG&E in the terms of that lease to leave it in-the easement, rather, to leave it in PG&E's control as to when the easement would be lifted, because the easement stated that it would be quit claimed by PG&E only when they entered into an agreement to relocate the facilities. They disabled themselves for an indeterminate time. Second of all, in Section 3.2, that issue was actually directly addressed because in two of the three applicable clauses in Section 3.2-13.2, rather, it refers to encumbrances or contracts affecting the property which would or could survive the closing date, which I don't think there's any dispute that that necessarily encompasses a temporary easement, even if it would if it-as long as it had the possibility of going past the closing date, which this one clearly did and, in fact, did. Third, there's the fund- Well, so you're basically not disputing-you recognize that, I mean, the factual findings are tough to overcome. All right. And so doesn't it basically come down in this situation because you've got, what is it, six of these vaults, I guess, right? Correct. And then you've got the power lines that are the easement going to for the water pump situation. Correct. The judge does make comments about that the judge feels that in some way that-is it Mr. Toll? Is that how we say it, or Toll? Toll Brothers. Toll. That Toll Brothers really was motivated by the fact that the economy had turned bad and so that they didn't want to perform for that reason. So my question is on that issue, does that really even matter, or is the issue really whether these six vaults and this easement are a material breach or not? That is correct. Motive does not matter in this circumstance. Did it matter to Judge Conte? It did matter to Judge Conte. Well, it did matter to Judge Conte. He made those remarks not only in his opinion and judgment, but also, again, if I recall correctly, in the order denying our motion to amend the findings of fact and conclusions of law. And he did make specific findings of fact, several of them, with regard to the economic situation, the effect on toll, and so on. Well, now, it would appear to me at the time that the judge made his ruling that the easement had been, that had been resolved by PG&E, right? The easement was finally quick claimed a year after the closing date. All right. That was in June of 2008. So I'm assuming from your perspective, though, this all has to be evaluated by what the situation was at the time that the Toll Brothers said they weren't going to go through. Is that right? Correct. All right. So in terms of if we accept the factual findings and it's not disputed that these are the issues that we're talking about, what are your best cases to say that that type of situation would be, you know, what's your best law that that would be a material breach? A material breach, the best law would be the law, I believe, that we cited as examples in, I'll say, footnote 16 on page 37 of our opening brief. And the reason I say that is this. And, again, I'm referring specifically now to the power line easement because I think that is the most clear example. Well, so one of the cases is Fristad, right? That has that. Yes. It's a California Court of Appeals case. Correct. That where it held that rescission by a buyer was valid. Here's the sum and substance of it. The title condition is always invariably at the heart of any purchase and sale agreement for real property in California. And I'll note that the respondents did not cite any case which said, well, you know, we can make a decision as to whether it's material or not if the property was not conveyed free of defects not previously agreed upon. And it's really undisputed, based even upon the findings of fact of the district court, that this encumbrance was not on the property at the time the purchase and sale agreement was entered into. It went right through the property. Consent was not sought. In fact, Toll only found out about it in April of 2007. Well, let me assume hypothetically on it. This is a hypo. Let's say that your client said, I don't want to go through with Part 3 because the economy's turned out. This is not good for me economically. And if it were good for me economically, I might be willing to negotiate with you. But because it's not good for me economically, I'm not going to, which the judge seemed to say all of those things. Yes. Does your client still win, even if those facts were true? My client wins. And why? Because of the fact that where there's an anticipatory impeach and blind repudiation, we are entitled to terminate at that time or at any time thereafter. And the leading cases there are the Central Hospital case and the Taylor case. Cooperation does not include waiving our absolute right. That's the equivalent, if I may say, of using the implied duty of good faith and fair dealing to override express terms of the contract. I don't think a contractual clause which requires cooperation requires us to waive, in effect, a material defect of the property and somehow come to some sort of closing agreement. You know, the fact of the matter is, also, we didn't terminate until December of 2007. I'm not sure how that isn't cooperation, quite frankly, because they had an extra six months to get rid of PG&E. Well, let me ask you this. Why aren't the LHINs correct that the six public utility vaults were required by the purchase and sale agreement because they were necessary to install utilities? The problem is that the specific locations were not necessary to the purchase and sale agreement. The fact is PG&E, in designing that utility backbone and the location of the vaults, was just like any other vendor. In other words, this was not a PG&E mandated location. PG&E happened to design them that way. And the contract specifically provides that for any type of utilities such as this that the LHINs are obligated to provide, they have to supply the land for it. Two of these were empty. Two of them served Fairway Ranch, which was the LHIN's property, and only two of them actually served subarea three. Okay. So basically what you're saying about that is it was the least expensive way to go across this way, but they could have gone this way or this way to get to it. That's right. Or they were supposed to talk to your client and get your client's permission. That's exactly right. And so far as the Court's ruling that somehow they had to wait until closing, and then the closing could be postponed because of the failure to accomplish the condition at that point in time of having the school property conveyed and the map recorded, that's not valid either, because, again, the law of anticipatory breach implied repudiation. Now, what if the district court ruled in your favor on the school, right? Correct. Okay. Do you want to save the balance of your time for rebuttal? Yes, that will be fine, Your Honor. Thank you. Good morning. Good morning, Your Honors. My name is Sue Handelman. I'm appearing as appellate counsel on behalf of the Lynn's. The trial counsel is with me, but I plan to, as is the case with my opponent who did the talking today. All right. You may proceed. Thank you very much, Your Honors. I'd like to start where Judge Gould asked a question, and I'd like to respond to that very same question. About why it wasn't a temporary easement? No. It's closed. Why it wasn't a material breach? Yes, that's exactly right. And it's someplace where you focus, too, Judge Callahan. The implication in Judge Gould's question was, gee, it says it's a temporary easement. Why am I stricken by the notion that this might not be a material breach? In fact, the law on material breach says that the breach has to affect the very root of the contract. And those are the cases that were cited in our brief, page 35. And what we have here, as far as the power line easements are concerned, is the running of the temporary easement to facilitate the contract, to facilitate actually the contract. Wasn't it indefinite? It was understood that it wouldn't be there forever. But by its terms, it was indefinite. It didn't say that it would last X number of months. It didn't say that it would last until the closing date. They were in a position of arguably taking title and possibly, you know, getting involved in disputes with another party over the use of their own land. Yes, there are two points there that I'd like to address. One is the closing date issue. And I'll get back to that. But the second one is the indefiniteness of the time for the easement. I think that's right. It's called a temporary non-exclusive easement. It's in the record. And that temporary easement calls for its extinguishment by the second party when the first party goes through the process. It's in the bottom of the first page of the easement, the process to apply to get it extinguished. Now, it's true. What you say is true, that there is no set date for its extinguishment. But I'm going to go with Toll Brothers have to extinguish it under that agreement. Toll Brothers would have the same extinguishment problem that, frankly, the LHINs have. But they're not a party to the contract. So if they went to PG&E, would PG&E even talk to them? They would have to because, as a matter of fact, the law in that area, and it's undisputed in the record, that the law doesn't permit overhead easements, overhead power lines to continue in existence. They're not permitted in the subdivision at all. So at some point, it's true there was an indefinite period of time for removal of the easement, but it was, in fact, temporary. And if you go back to look at what Judge Conte was looking at, he was looking at the circumstances for the creation of it and when it would no longer be needed. But what if it had closed just right then and Toll Brothers was ready to start building, to shovel dirt, to do all of that, which was not the case, but it could have been? Would then it have been a material breach? I don't think so because Toll Brothers, as a fact in the record, as a fact, it was discussed by Toll themselves that they abandoned even planning on Subarea 3 in the fall of 2006. Well, I guess that, and that's, it seems that Judge Conte was concerned that the Toll Brothers were motivated by a change in the economy and that they essentially wanted to get out of the contract because apparently there had been two other dealings. This was Part 3 of Part 1-2 and 1-2 had, yes. So the court was, so Judge Conte was concerned about that that was it, was Judge Conte seemed to be saying that if the economy were better, you would be negotiated, this should have been worked out, and the fact that you weren't even really ready to do anything, how can you claim any harm? The cases, though, seem to say that a person's entitled to take the property free of encumbrances and if there's a cloud on their title or on their use or whatever, they've got a material breach. So why do any of those things that Judge Conte was talking about even matter? Because a breach of contract is a question of fact. The law is that it must be. But is it a question of your intent? It seems to me, you know, that's the whole thing. Let's say he had the intent because it wasn't good for him to build and he doesn't, you know, the economy wasn't good, all of that. Isn't it a question of whether those six faults and whether that easement are a material breach, regardless of why he wanted to not go through? The judge was charged with looking at the circumstances of this particular contract. The judge made a particular point of going through the whole panoply of performances that were required by both sides. And so this is not a contract like the ones that are in footnote 16 of the plaintiff's or the appellant's opening brief. This is a contract that required our side to put $5 million into subarea 3 in backbone infrastructure. It required the parties to cooperate. In fact, as to say the question of whether the subject of intent for why someone doesn't go through is something the Court can factor in. The Court simply observed that the subjective intent of what the testimony was at trial. The fact is that there was testimony that the market was in a tailspin at the time of the, really by the time the second close came along, it was going down. And by the time of the third close, it was a wreck. That was testified to. It was in evidence. It wasn't objected to. It's just a fact. But is it legally relevant to whether it's a material breach? It may not be. What's relevant to whether it's a material breach is whether that power line, temporary or the vaults, had went to the root of the contract, deprived them of the benefits of the contract. And their own witness, Mr. Painter, said that given the timetable, the toll was on at the time of the close or the time for closing. I need to get back to that, Judge Gould, because or, sorry, Judge Corman, because that's an important point here. That because the power line was, their own witness said that it was not a material problem to them based on the timeline or a material, had no material impact on their building plans because they had stopped planning. And we were ready. So that even if the easement were for five years, it wouldn't matter under this argument? That's not what I'm saying. The easement wasn't for five years. No, no, no. But I'm trying to understand your argument. And so they, you know, the market is terrible, and they decide they're not going to do anything as if they probably haven't done anything yet or wouldn't have done anything. So let's assume you gave a five-year easement. I gather the easement itself, that it was a breach, is not in dispute. But would that be, would that have been a material breach even though Toll Brothers had decided that, you know, we don't intend to build for five more years? Yeah. I think that's a different factual scenario, and I'm not sure what the Court would have decided if the easement had been given for five years. But keep in mind that the need for that easement was extinguished as of nine months before the scheduled close, and that gets me back to that close date again that I've got to get to. It was the — It wasn't removed. It was the application was made. Right. And it was expected to be removed before the close date, which was in the papers, which was June 30th. But it wasn't. It wasn't. It's true. And even Mr. Inouye, who is one of the toll witnesses, testified that PG&E is as slow as molasses. It's difficult sometimes to get through the bureaucracy. And we didn't stop. We continued. And that temporary easement was, in fact, removed within a year after the first scheduled close. Now, let me get to close. I have to make something very clear because I'm not sure it is clear. Were they supposed to, when they bargained for clear title, did they bargain for getting involved with the PGA for, you know, a year-long process to try and get this removed? And, in fact, there was never — there was no expectation that they could have — they could have voluntarily taken on the obligation to deal with PG&E over this temporary easement, which had to be removed under city law. But, in fact, they didn't want to. And so the close — and here's the key fact. Under Section 6.1 of the agreement, the close date is either — it's the later of. This is 6.1. The dates for the respective closings shall be the later of, A, the discrete dates set forth above, or, B, if the special closing conditions and general closing conditions have not been satisfied as of the discrete dates set forth above, then three days after the special closing conditions and general closing conditions have been satisfied. So in this case, there was not a set closing date as there is in many land transactions. It was the later of, the date set forth, or when the conditions are satisfied, which was crucial to this kind of a deal because of the many uncertainties having to do with Subarea 3. At the time that the contract was entered, which was in 2004, the parties had a general idea of what Subarea 1 and Subarea 2 would look like and were able to negotiate meets and bounds for the two. Would your argument be stronger if your client had consulted with the Toll Brothers about these things before doing them? Interestingly, I know that the argument has been made that, oh, we were being secretive about it. As a matter of fact, keep in mind the timing. Well, okay, but it seems from the record it was undisputed that they didn't consult with the Toll Brothers before they did these things. It wasn't, yes. The easement was negotiated, the overhead power easement was negotiated at the end of 2005 as the parties were getting ready to close Subarea 2. All right. But you're not answering the questions directly. Did they consult the Toll Brothers before the easement was there? They did not consult the Toll Brothers, nor was there any obligation in the contract for them to consult. Now, here's and I'm hoping not to irritate but to answer, and so I feel like I'm verging on that and I'm not meaning to. The agreement Well, it might help if you looked at it as the time that you think is yours is really our time in the sense that we prepare for these before. And so it's really our time to, you know, we have read everything. And so it's our time to ask questions that maybe are, we're struggling with. So feeling frustrated that you're not saying what you want to say, it's really more important to answer our questions. Oh, I Because we're going to decide the case. I appreciate that, Your Honor. I do. All right. But that being said, go ahead and Section 13.2 of the PSA, the Purchase and Sale Agreement, and there also the escrow agreement, escrow instruction says, except as necessary to comply with the terms of this agreement, we shall not sell and cumber transfer. And the fact that Judge Conte found was that the power line easement was necessary to get that pump station working and was necessary for us to get those affordable housing credits out of Fairway. But it wasn't, if I understood your adversary, some power was necessary, but it didn't have to be this power line easement. That's, it's very possible. In fact, there was another route discussed. And it was not our client who called the shots on that easement. It was PG&E. And in fact, the Water District, San Ramon Services District, and PG&E paid for that line. Well, I think maybe more importantly, did the district court find that that was not the only way to get power there? Didn't expressly find it was not the only way. What the court found was that it was the least expensive way. All right. But it was the least expensive way, but doesn't that imply that there were other more expensive ways? I understand my opponent's argument on that, and I can't disagree with that. However, that existence for the time that it was there, the power line's existence did not materially interfere with Toll's use of the property. Toll hadn't done anything to even instigate planning or reinstitute planning after they quit planning when we were already trying to get that power line removed. So there was a confluence of factors going into effect at the same time. They didn't want to develop the property. They weren't planning to develop the property. And we, at that very time, nine months before the close date, which could be extended to a later date if performance wasn't complete, be extended. And as the Court found, because the school site had not been transferred to my client as one of the closing conditions of the – that was required for subarea 3, that property, that closing date of June 30th, 2007, was not going to happen anyway because the other conditions hadn't been met. The district court ruled in Toll Brothers' favor on your school conveyance argument. They – the district court said that we had the right to extend – expressly ruled that my clients had the right to extend the escrow because the school hadn't been transferred, the school hadn't been retransferred. Now, where – what you're referring to, I think, Judge Callahan, is the expressed cross-action or the counterclaim that we had for their breach for not having conveyed the school site. The Court did not rule in our favor on that counterclaim, but did say expressly in the decision that the lack of conveyance of the school site automatically extended the time. And that's not before us here today. No, it isn't. All right. Your time has expired, but let me find out if my colleagues have any additional questions. That would be before I have you sit down. Judge Gould, do you have any additional questions? No, I don't. Judge Corman? I thought that the district court found that Toll's failure to reconvey the school site was not a failure to perform a condition preceding to Lynn's duty to sell subarea 3. That's right. That's – if I might, Your Honor, that is a finding having to do with our counterclaim that Toll breached by failing to do that. A finding. Whatever legal issue it was relevant to. It's rule of the case. It's true. But in other parts of the decision, the effect of the failure to reconvey the school district site was not – it didn't trigger a breach at that moment for – that we had asserted in our counterclaim. However, the court ruled in the – as to the reconveyance that that did – the failure to reconvey did trigger our opportunity and the need to trigger 6.1B, the automatic suspension of the escrow. All right. Thank you for your argument. Thank you. Could you address the 6.1 argument that they had three business days after all special closing conditions and general conditions have been satisfied, which sort of suggests they're kind of an indefinite? Here's the – here's the problem with that argument, both as propounded by respondents and as put forth by the district court. Once again, the law of anticipatory breach implied repudiation specifically states, and you can find this especially in the central hospital case, that once an anticipatory breach has occurred, the other party is immediately relieved of any further performance obligations. To put it in the vernacular, once the anticipatory breach occurs, if the other party has not immediately terminated the contract, they don't have to do anything further unless the anticipatorily breaching party either retracts or nullifies the repudiation. And in the case of implied repudiation, that means doing what they had previously disabled themselves. I don't know. I want to understand. Does that override the clause in the agreement? Is the clause in the agreement otherwise applicable? I mean, does the case law render this language irrelevant? Or does – I don't know. The case law of anticipatory breach and implied repudiation in the first instance – The anticipatory breach was what? That they – what exactly – That they put it out of their power to – Procure it. To get rid of the easement because they left it entirely up to PG&E. Right. That renders that section moot. But on top of that, the judge did something – It in effect provides that the closing date could be three days after all the special closing conditions and general conditions have been satisfied. But we're talking here about anticipatory breach, not simply about a failure of closing conditions. And I believe that the district court fell squarely into that error. And let me add that there's a – there's another unique little problem here. The district court, even though it actually admitted and stated in the fees motion that even the LHINs had not argued this point, the district court ruled that because the LHINs could have extended under that section, which we believe is wrong anyway for the reasons I've just stated, they could have extended. Therefore, we were not entitled to terminate the contract later. It's undisputed that the LHINs did not actually extend the contract. And in fact, the district court docked the LHINs on the attorney's fees clause specifically because of the fact that he had ruled on a point that they had not argued. So are you saying there was a factual finding that there had been no extension of the contract under that particular section? There is – let me put it this way. There is no factual finding that the contract was actually extended. Judge Conte specifically ruled, and he used the words, could have – the LHINs could have extended the contract. There is no factual finding that it was extended. In other words, they didn't – the LHINs didn't say we were extending the closing date. Correct. That's correct. They didn't ask to extend. So I have a question if I could ask this. And this just relates to my own thinking about the case. The panel may not share this question, but it is assuming we determined that LHIN – that the LHINs had breached the contract but we thought the record wasn't clear as to whether it was a partial breach or a material breach. Would the right procedure be to send that back to the district court for more proceedings and findings? Respectfully, Your Honor, I don't believe as a matter of law the court could decide that because it is the law in California that a failure to deliver unencumbered title except as to agreed-upon encumbrances is by definition a material breach because it goes to the root of the contract, which is why if clean title is not delivered, rescission is permitted. Well, but I think what Judge Gould is – okay, you're not conceding your point. What Judge Gould is saying, if – assume that, would it go back at that point to determine? Say that again. Assuming there's a breach, we don't know. We're not prepared to accept the authority that you're arguing saying the encumbrance is always material. Would the answer be for us to try to answer that partial or material breach question on the record, or would it be to send it back to the district court, which, of course, the district court didn't think there was any breach by the Lins, right? Well, the district court also alternatively said that under the circumstances, he didn't believe it was material, and that's something that we've identified as erroneous as a matter of law. Okay. And I guess I'm not trying to be obtuse, although I frequently am. I'm having trouble wrapping my hands around the question because of the fact, I believe that the district court, when viewing the law correctly, would have to rule that as a matter of law, the failure to deliver clean title is secure. Well, I think your answer would then be that it wouldn't go back because the facts are undisputed. It's illegal that it would be for this court to apply the case as it is either a matter of law, that it is a material breach or it isn't. That is correct. All right. That's what I would understand you saying. I think I also understood you to say the district court has already addressed that issue. It addressed that issue. It addressed it erroneously. All right. Thank you. Thank you, Your Honor. We've taken both of you over time, but thank you both for your helpful argument in this matter. It will stand submitted.
judges: Korman, Gould, Callahan